1

2

3

4

5.                                    UNITED STATES DISTRICT COURT

6.                              WESTERN DISTRICT OF WASHINGTON

7

8. William L. Harris                              The Honorable Theresa L. Fricke

9. Pro se Litigant

10.     Plaintiff,                                CASE NO. 2:20-CV-01045-TLF

11.                                               PLAINTIFF'S  MOTION FOR LEAVE TO

12.     v.                                        FILE AMENDED COMPLAINT

13.

14.                                               NOTING DATE: July 02, 2021

15. City of Kent

16 Tom Clark.                                     Jury trial

17 Jacob Reed

18 Jason Nixon

19 Jones Lang LaSalle Americas, Inc ("JLL")

20 Curt Thornburg

21.         Defendants

22

23

24                              **I. INTRODUCTION**

25 Pursuant to Rule 15 of the Federal Rules of Civil Procedure and Rule 15 of this court, plaintiff William

26. L. Harris respectfully moves the Court for Leave to File an Amended Complaint adding two additional

27 defendants, addressing additional evidence of negligence outlined by the Court in it's previous order

28 and substantially increasing the amount of damages being sought. Plaintiff has sought to incorporate

MOTION FOR LEAVE TO FILE AMENDED COMPLAINT-1. 2:20cv1045tlf.     William Harris pro se

1 all claims and defendants into one claim while carefully weighing the responsibility not to cause

2. unnecessary delay in these proceedings. Plaintiff submits this final amended complaint includes all of

3 defendants and claims necessary to render a decision that is fair and just. Rule 15 provides that "a

4 party may amend its pleading [with] the courts leave" and "that the court should freely give leave

5. when justice so requires ". Fed. R. Civ. P. 15(a)(2). Plaintiff moves to file the Amended Complaint

6. based on recent evidence and defendants claim that plaintiff needed proof that he could legally

7. use public accommodations despite the fact that he was an honorably discharged, U.S. military

8 veteran, U.S. citizen, and once held a range of other professional positions within the U.S government.

9. Plaintiff enjoys the same constitutional and civil rights protections as all other citizens despite being

11 told to produce some sort of "authorization papers" when ordered to do so by kent police or face

11 arrest by use of force while acting under color of law. Defendants have argued that when plaintiff

12 could not produce such "papers" the state had probable cause to then force him half naked into a

13 waiting police vehicle and cart him off to jail, with the assistance of the property owner who was in

14 full violation of the law designed to protect individuals such as plaintiff. Subsequent to the finding of

15 this Court that plaintiff had plead a sufficient cause of action defendants moved on to false claims of

16 immunity despite the fact that their actions violated "clearly established " federal laws and civil

17 rights protections. Plaintiff moves to file the complaint prior to the scheduling or beginning of

18 fact discovery. Allowing plaintiff to file the Amended Complaint would serve justice, preclude more

19 litigation, and promote judicial efficiency. Further, there would be no substantial or undue prejudice

20 bad faith, undue delay, or futility. Despite having sworn an oath to uphold and defend the

21 Constitution of the United States of America and having previously been put in very dangerous

22 situations in furtherance of that oath plaintiff has been forced ,during these proceedings, to defend

23 himself against claims that although he was in the public square of a community shopping center

24 enjoyed by all he was subject to arrest when he could not comply with some unknown autholrization

25 demand. Despite his attempts to explain that his special authorization "papers" were called the U.S.

26 Constitution, federal laws, and the Bill of Rights neither of defendants Reed, Nixon, Thornburg, nor

27 Clark cared to listen. To this day defendants claim they still do not yet know if plaintiff had a federal

28 protection to engage in activity such as plugging in a cord until they see a ruling from the court. The

MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT-2.     2:20CV1045TLF.     William L. Harris pro se

1 history that all citizens are equal before the law is taught in grade school. Defendants claim that until

2 they see a ruling from the court they will argue Reed had probable cause to require special authority

3 from plaintiff. Accompanying exhibits include a electrical charging station less than two blocks from

4 kent city hall and the Kent police department. None of those individuals have such demands placed

5 on them at risk of forcible arrest. The fact that Kent officers as well as front line supervisors don't

6 respect and view the rule of law as applying to all is chilling. That they would encourage each other

7 online to preemptively hurt peaceful individuals is sick. That the chief knew appalling. Reed conspired

8 with Thornburg to engage in an unlawful prosecution,  Reed and Nixon were unlawfully acting

9 under color of law, Clark was being updated by Reed but shirking his responsibility to  calls for help

10 by refusing to respond even as he heard in the background that all of this was escalating. The NFL

11  game was just beginning.  At no time did any of the defendants explain to Plaintiff which

12 individuals or groups must carry authorization papers, to which agents of the state they must be

13 presented,  why this carve out to the U.S. constitution has never been explained,  and why it is

14 enforced on some individuals and not others. Taken together Plaintiff argues the conduct of each

15 defendant was legally and morally reprehensible and as a result plaintiff continues to suffer the

16 trauma associated with his knowledge of ugly history and the events playing out in this case.

17 Events such as the three-fifths rule, demands for identity papers, targeted persecutions, and the like

18 all started with certain groups believing that they had absolute immunity to go after certain other

19 groups and victimize them at will. As a result of this  plaintiff seeks an additional 1.5 million dollars in

20 general damages and an additional 1.5 million dollars in punitive damages in the proposed  Amended

21 Complaint. Despite Reed's incoherent claims of a probable cause to arrest for a lack of authorization

22 papers, Clark's refusal to respond while the football game was beginning,  Nixon's assault and failure

23 to render aid during the arrest, and Thornburg's conspiring, lying about a theft, and a documented

24 rush to conceal the evidence defendants continue to claim they possess an unheard of immunity and

25 plaintiff lacked unheard of special authorizations leading to his  arrest. In response to the Court's

26 prior statement that a single instance of questionable police conduct is insufficient for a finding of

27 negligence plaintiff brought forward an additional instance in a previously amended complaint that

28 met the Courts December 14, 2020 deadline.  Since that time an astonishing array of evidence of

MOTION FOR LESVE TO FILE AN AMENDED COMPLAINT-3.     2:20CV1045TLF.   William L. Harris pro se

1 beatings, shootings, and incredibly aggressive violence directed at predominantly African American

2 males by Kent police officers has been released through various media sources. All of these articles

3 described the Kent police leadership being called repeatedly before kent city leaders to explain these

4 ultra aggressive tactics and the myriad litigation efforts and millions in settlements that followed. Also

5 discussions of kent city leaders confronting the Kent police chief regarding vicious comments

6 made on social media sites run by Kent police officers. The comments included pleas for various

7 officers to confront and violently attack those exercising their constitutional rights to protest police

8 violence, especially those protesting the treatment of persons of color. In one of the comments

9 an officer implored his fellow officers to hit protesters in the "f- - -king mouth" and then ask who

10 they were going to call since they were already protesting the police. According to the reporting

11 the chief then went back and asked the officers union head to implore the officers not to be so

12 vocal with their thoughts on inflicting injury on peaceful demonstrators. The department also

13 admitted that they made no effort to collect statistics on the problem areas within the department

14 even as issues with problem officers started to fester. Plaintiff believes stats were purposely

15 neglected in order to support a claim of plausible deniability on the part leaders. A subculture of

16 policing involving targeted, extremely aggressive, treatment of predominantly black men was allowed

17 develop within the department with the knowledge of police leadership. Plaintiff argues this is what

18 led to the savage beating of a black man with a police dog by four kent police officers on the side of a

19 road in the city, for a minor misdemeanor warrant. Plaintiff argues this is what also led to Jacob Reed

20 pulling out his collapsible baton, putting on his heavy duty work gloves and screaming with rage after

21 he and Nixon peered into plaintiff 's vehicle and saw who was asleep. Would he have reacted the way

22 he did if he had seen many other groups just sleeping? Plaintiff argues the answer is unequivocally no

23 As pleaded in a prior filing the city and police leaders knew the had a problem with an unchecked,

24 subculture of officers who were targeting predominantly black men. They chose to abandon their

25 duty of care and simply allowed this dangerous situation to grow. By not even tracking these people

26 within their own environs and setting them lose on individuals such as plaintiff and others and then

27 requesting these individuals simply keep quiet about how they wanted to hurt certain members of

28 the public this was the definition of negligence, plaintiff argues. These posts as identified in a review

MOTION FOR LEAVE TO FILE AMENDED COMPLAINT-4.        2:20CV1045TLF.   William L Harris  pro se

1 along with a detailed accounting of the numerous cases already identified included

2 beatings, shootings, made up charges of obstruction, and the millions ultimately paid in settlements

3 will be a major focus of any plaintiff trial presentation.  Plaintiff would  request usernames and

4 password information to certain kent police sites to give the fullest picture of what he has already

5 discovered which goes to the state of mind of the individuals who abused and unlawfully arrested him.

6                                  **II. LEGAL STANDARD AND ARGUMENT**

7 Rule 15 provides that "a party may amend its pleading [with] the Court's leave and that the Court

8 should freely give leave when justice so requires. There is absolutely no question that plaintiff had

9.the same federal protections as are enjoyed by every citizen infringed upon by defendants on 15

10 December 2019. Only in totalitarian and autocratic regimes are individuals stopped by the secret

11 police with demands to show their "papers" while in public places or engaging in certain activities.

12 When Jacob Reed first accosted plaintiff he claimed it was because he had delusions of seeing a cord

13 "tapped into a light pole" which gave away his lie that he knew nothing about the applicable city

14 codes. After realizing this nonsense was an incoherent mess he switched to a claim that running an

15 electrical cord in between a fixed position to a vehicle in a public area is considered stealing unless

16 the vehicle owner has specific authorization from the owner to do so. Harris had not contacted the

17 owner of the public shopping center, according to defendants phone call, therefore his arrest for

18 theft. When plaintiff explained his  law enforcement background and that none of what Reed said

19. made any sense a supervisor was requested  to respond. Plaintiff was advised this would not happen

20 until he was booked into jail. As identified in the submitted exhibits right down the street from the

21 Kent City Hall and Kent Police Station is an electrical charging facility where electrical cords are run

22 to vehicles all day long as they are done all over the world. Electricity is one of the cleaner fuels that

23 the world is turning to and away from fossil fuels. The U.S. Constitution and other federal statutes

24 including civil rights law strictly prohibit and outlaw any level of biased and unequal treatment as

25 practiced by defendants. Plaintiff argues the legal question as very simple: did he have a right to

26 partake of those activities as protected under the constitution and enjoyed by every other citizen

27 or was he required to reach out to the owner of the property, who was in violation of city law, in

28 order to singularly provide documentation of his right to enjoy those freedoms under federal law?

1                                    III. CONCLUSION

2

3 Despite there being no genuine dispute as to any material fact here and plaintiff's argument that he is
4 entitled to judgment based upon all of the facts, evidence, and matters of law defendants continue
5 to cling to the hope that officer Jacob Reed's faulty and preposterous interpretation and violation of
6 federal protections will stand. The fact that neither of the other officers at the scene, the
7 first line patrol supervisor who was being urgently requested, nor the property manager who knew
8 there was a dawn to dusk kill switch on the outlet so it couldn't be a theft case, bothered to check if
9 the outlet was posted, what the city law stated, how you could arrest someone in a public area
10 attempting to plug in a cord or whether they just put aside their legal duty and responsibility to
11 acquiesce to an individual who had set the whole scene up for excitement and to pad his arrest
12 statistics. With Reed yelling and screaming with rage while having just put away a metal baton
13 weapon plaintiff remained in fear of his life while pleading with Nixon to intervene at the scene and
14 pleading with Clark to respond using a loud voice in the back of the patrol wagon. Neither of them
15 exercised any duty of care, compassion, or desire to de-escalate Reed in the slightest. Much of this
16 could have been mitigated had Thornburg simply told the truth when Reed called instead of lying,
17 conspiring, and then immediately rushing, on a Sunday afternoon, to have his maintenance vendor
18 hurriedly pull that outlet. Every statement made by plaintiff shall be proven, if need be, in a court of
19 law. Plaintiff submits that all defendants are now properly listed in the complaint.

20

21 (Note: In the cases uncovered so far, despite the fact that African American men have suffered
22 devastating, and at times lethal assaults, directed at them by the City of Kent Police Department
23 there has yet to be even one sustained criminal charge. This even accounts for their old, standby,
24 " go to" ,charge of obstruction. It appears the local, municipal, court, officials are well onto the racist
25 violations, being played out on the streets of the city by some. The reportedly, incendiary, hate-
26 filled, extremely violent, social media comments by some Kent police officers will hold the key.)

27

28

MOTION FOR LEAVE TO FILE AMENDED COMPLAINT-6.        2:20cv1045tlf.  William L Harris pro se

1

2

3

4.                    UNITED STATES  DISTRICT  COURT

5                    WESTERN DISTRICT OF WASHINGTON

6

7. William L Harris.                      2:20cv1045tlf

8 Pro se Litigant.                        **ORDER GRANTING MOTION FOR**

9.       Plaintiff,                       **AMENDED COMPLAINT [proposed]**

10.                                       NOTING DATE: July 02, 2021

11       v.                               Jury trial

12 City of Kent

13 Tom Clark

14  Jacob D. Reed

15 Jason Nixon

16 Jones Lang LaSalle America's, Inc ("JLL)

17 Curt Thornburg

18.       Defendants

19

20. This matter is before the court on plaintiff William L. Harris's

21. Motion For Amended Complaint. The Court considered the following

22  presented on the motion:

23  A. Harris's Motion For Amended Complaint

24. B. _____

25. C. _____

ORDER-1

CASE NO. 2:20-CV-01045-TLF          William L. Harris.          Pro se

1 Based on the argument of plaintiff and pleadings presented, the Court

2 orders as follows:

3

4 A. The Motion for Amended Complaint is GRANTED.

5. B. _____

6 C. _____

7. D. _____

8. E. _____

9 Dated: July  2021

10

11

12.                    _____

13.                    Theresa L. Fricke

14.                    United States Magistrate Judge

15

16

17 Presented By

18

19 /s/ William L. Harris

20 June 14, 2021

21 William L. Harris

22 Pro se Litigant

23 williamlharris@msn.com

24

25

26

ORDER -2

CASE NO. 2:20-CV-01045-TLF.      William L Harris.      Pro se

1

2

3

4.                     UNITED STATES DISTRICT COURT

5.                  WESTERN DISTRICT OF WASHINGTON

6

7  William L. Harris.                    The Honorable Theresa L. Fricke

8. Pro se Litigant

9.      Plaintiff,                       CASE NO. 2:20-CV-01045-TLF

10.                                      FOURTH AMENDED COMPLAINT FOR

11.   v.                                 VIOLATION OF CIVIL RIGHTS

12.                                      Jury trial

13  City of Kent

14. Tom Clark

15. Jacob D. Reed

16. Jason Nixon

17. Jones Lang LaSalle America's Inc ("JLL")

18. Curt Thornburg

19.      Defendants

20

21

22.             I. THE PARTIES TO THIS COMPLAINT

23. A.    Plaintiff

24.                    William L. Harris

25.                    325 Washington Avenue South #397

26.                    Kent,          King County

27.                    Washington.    98032

28.                    206 697 7645

1 B.      Defendant No. 1

2.                City of Kent

3.                220 4th Av S

4.                Kent.        King County

5.                Washington,      98032

6.                253 856 5200

7                 Official capacity

8.       Defendant No. 2

9.                Tom Clark

10.               Supervisory Police officer

11.               232 4th Av S

12.               Kent.        King County

13.               Washington,      98032

14.               253 856 5800

15.               Official capacity

16.       Defendant No. 3

17.               Jacob D. Reed

18.               Police officer

19.               232 4th Av S

20.               Kent,        King County

21.               Washington      98032

22.               253 856 5800

23.               Official capacity

24.       Defendant No. 4

25.               Jason Nixon

26.               Police officer

27.               232 4th Av S

28.               Kent,        King County

1.                  253 856 5800

2.                  Official capacity

3.        Defendant No. 5

4.                  Jones Lang LaSalle America's Inc, ("JLL")

5                   601 Union Street #3525

6.                  Seattle,          King County

7.                  Washington 98101

8.                  206 576 0050

9.                  Official capacity

10.       Defendant No. 6

11.                 Curt Thornburg

12.                 Property manager

13.                 JLL Property Management

14.                 8902 45th Place W

15.                 Mukilteo,         Snohomish County

16.                 Washington 98275

17.                 206 949 2497

18.                 Official capacity

19

20.                      II.   PREVIOUS LAWSUITS

21. Plaintiff has brought one previous lawsuit in federal court in the United States

22. Description:

23

24. Breach of implied contract (diversity), promissory estoppel, defamation, negligent

25. infliction of emotional distress, outrage

26

27. Parties:

28. William Harris

4th AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS-3 2:20cv1045tlf. William L. Harris pro se

1  Sears Holdings Corporation

2

3  Plaintiff

4. William Harris

5. Defendant

6. Sears Holdings Corporation

7

8

9.   Court and name of district:

10. United States District Court Western District of Washington

11  Docket Number: 2:10-cv-01339-MJP(W.D. Wash Jan 24 2011)

12. Assigned Judge:  Honorable Marsha J. Pechman

13. Disposition:       Settled

 14 Approximate filing date of suit: July 2010

15

16.                     **III. BASIS FOR JURISDICTION**

17. A. 42 U.S.C. 1983 "deprivation of any rights, privileges,  or immunities secured by the

18. Constitution and federal laws. "

19

20. B.

21.   4th Amendment to the U.S. Constitution

22.   Equal Protection Clause under the 14th amendment to the U.S. Constitution

23

24. C.

25    Title II of the Civil Rights Act of 1964(Public Accommodations)

26

27. D.

28.   28 U.S.C. 4101 Defamation

1 E. Title 18 U.S.C Section 241 Conspiracy against rights

2.   Negligence

3. Plaintiff argues there is an out of control segment within the Kent police department comprised of
4 a subculture of individuals who have a disdain for the rule of law and an outright hatred of certain
5 groups they are sworn to serve. The brutal actions of Jacob D. Reed, complicity of Jason Nixon and
6.Thornburg, as well the official indifference and unlawful negligence of supervisor Sgt. Tom Clark whose
7 job was to ensure his officers fairly enforced the law makes each of them fittingly listed as defendants
8 in this lawsuit. Reed, Nixon, and Clark possessed many hours of city taxpayer paid training and
9 experience to all know and understand the universal constitutional and federal law protections
10 afforded the individuals they served, including Harris. Acquiescing and submitting to the unlawful,
11 nonsensical, ramblings, of Jacob D. Reed and the failure to respond, intervene, or tell Reed to knock
12 it off, or to call for medical attention to an individual in distress complaining of sharp pains is both
13 distressing and disheartening to a former law enforcement officer who understands the profession is
14 under great strain to weed out the "bad apples". Plaintiff has alleged and, seemingly, every few
15 weeks another news article is released of a police department either settling or engaged in another
16 round of political turmoil over it's police treatment of predominantly black males. Invariably, no
17 charges are ever sustained against the individual and the city taxpayers end up paying another
18 substantial sum. Plaintiff argues this is part of a pattern and practice in which a subculture of very
19 violent officers have taken to social media and the streets to target black men in the city for very
20 aggressive, brutal, enforcement tactics. Plaintiff further alleges it is not by coincidence that other
21 races and sexes are not ending up in these articles. In one of the articles an officer speaks of how a
22 black male did not show him respect and was using off-color language. In another article the chief
23 spoke to city leaders regarding social media posts that Kent officers were making regarding hurting
24 peaceful protestors opposing police treatment of persons of color. In one post, a person identified
25 as a kent police officer implored other officers to hit protesters in " the f _ _ king mouth" and then
26 ask them who they were going to call since they were already protesting the police. The chief is
27 quoted as responding that when he found out what was being posted he called the head of the kent
28 police guild to ask him to have the officers watch what they posted on-line. No admonishment that
4[th] AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS-5.  2:2:20CV1045TLF  William L Harris Pro se

1 racist, violent, attitudes, espousing injuring individuals, expressing their constitutional rights would not
2 be tolerated. No reminders that officers who cannot reflect the values painted on Kent patrol cars of
3 professionalism, integrity, and service, both on and off duty, needed to seriously consider resigning.
4 Instead there was a plea that too much bad publicity about the true feelings of certain officers was
5 making it's way into the public domain and for the head of the guild to please speak to the members.
6 The information being uncovered in plaintiff's pursuit of his claim is of a group of Kent officers who
7 absolutely will not tolerate anything but the most docile and deferential conduct from black males,
8 and a leadership team willing to look the other way unless bad publicity is generated. A street attitude
9 exists of even if you cannot arrest them for legitimate conduct just make up something and if none of
10 that works and if they say anything other than "yes sir" or "no sir" charge them with obstruction/
11 resisting arrest. Even if the courts throw it out you still get to count the stats.  Some officers engage
12 in these tactics out of racial hatred, others feel that targeting black men is simply the most expedient
13 way to get choice assignments and promotions. Reed initially claimed that on a clear day he imagined
14 plaintiff "tapping into light pole". After realizing others could plainly see this was gibberish Reed
15 changed his story to an even more incredible claim that in order for Harris to have an electrical
16 connection running from an automobile to a fixed point in a public shopping center parking lot, which
17 is increasingly common, he needed to have some type of authority directly from JLL and Thornburg.
18 See attached exhibits. Reed also threw in the Kent police sham, go to, charge of obstruction. When
19 plaintiff objected and tried to explain to Nixon and Reed that there was no criminal activity being
20 committed they began twisting his hands. His gym shorts draw string came loose and he was forced
21 into the back of a patrol car. All of this was being communicated to Clark at the time as well as urgent
22 pleas from Harris that the situation had escalated beyond the reason of officers at the scene and
23 Clark needed to physically respond.  Plaintiff was advised Clark would not be responding or speaking
24 with him until plaintiff was booked into jail. At the time a Seattle Seahawks v. Carolina Panthers game
25 was about to start as plaintiff later heard it playing as he was being strip searched at the jail. Leaders
26 in both kent city government as well as the police department knew there were police officers
27 espousing views hateful and hurtful to the very individuals they had committed, and were paid, to
28 serve. The evidence increasingly shows those leaders allowed a subculture of toxic views to not only
4th AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS-6 2:20cv1045tlf William L Harris. Pro se

1 survive but flourish within their police department employee ranks. Plaintiff alleges Reed's actions

2 reflected that culture and that fellow officers , who knew better willingly participated in, or stood by,

3 during this unlawful conduct. Curt Thornburg knew he was in trouble the minute Reed's repeated

4. attempts to reach him got through. As property manager he knew the parking lot lighting facility had

5 a dawn to dusk, cost-saving, kill switch technology installed so there was no way anyone was

6 "stealing electricity ". Even so he knew he had just lied and conspired with Reed to engage in

7 prosecution of an individual who was legally on the property attempting to use an outlet that

8 Thornburg should have had removed long ago, according to city code. Instead Reed was now taking

9 this individual to jail. Thornburg sought to cover his tracks by immediately, according to his

10 declaration, contacting his maintenance vendor on a Sunday afternoon and making plans to have the

11 outlet removed right away. Plaintiff has obtained specs for the light from the lightning company

12 proving Thornburg lied during the initial investigation and in submissions to this court. In a last ditch

13 defense, defendants now claim that despite clear violations of "clearly established " probable cause

14 protocols defendants possess immunity because a decorated, U.S. military veteran, who was

15 lawfully, located in a parking lot open to the general public and protected under federal civil rights

16 and the U.S. Constitution needed to have supplemental authorizations from the shopping center

17 managers/owners in order to grieve in peace. Harris needed to prove he had the rights others had.

18 When he could not do so he was taken to jail, as per Reed, assisted by Nixon, and approved by Clark.

19. This is not the antebellum south and respect is not given it is hard- earned. Those kent police officers

20. who express hatred and vitriol online towards those they are sworn to protect and serve will

21. increasingly end up in this federal court. That is exactly what is occurring. Plaintiff knows firsthand

22. how hard it is to be a police officer. Plaintiff has performed traffic stops in the middle of the night

23. with backup units still miles away. Plaintiff has been repeatedly called the N-word from a individual

24. in the back seat being transported to the local state police barracks for testing after plaintiff arrested

25. him for drunk driving. Plaintiff has been on tactical teams of highly trained agents going through

26. doors not knowing what awaited on the other side. Kent police cannot make the claim plaintiff

27 does not know what it's like. Any in Kent PD who believe an individual is a suspect simply because of

28. their skin color or whether they are male or female should resign today.

4th AMENDED COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS-7 2:20cv1045tlf William L. Harris pro se

1                              **IV. STATEMENT OF CLAIMS**

2 4th Amendment- On Sunday, December 15, 201,  plaintiff William Harris was accosted by Kent police
3 officers Jacob D. Reed and Jason Nixon. Reed claimed by virtue of Harris having an electrical cord
4. running from his vehicle to an electrical outlet attached to a pole this constituted stealing. Reed also
5 explained that since Harris did not extricate himself from his vehicle in the required amount of time
6 he would also be going to jail for obstruction as well as tampering.  Reed claimed the tampering
7 charge was because Reed initially thought he saw the cord "tapped" into the pole. Reed and Nixon
8 then both used tactical hand control techniques to forcibly remove Harris from his vehicle and place
9 him in handcuffs which caused excruciating pain as they were severely tightened. Harris requested to
10 to cloth himself as he was preparing to go to the gym to deal with the stress and grief he was under
11 after just learning his brother was dying from a terminal illness.  His gym shorts string had come loose
12 as he slept in the car although the back windows were tinted and he was under a thick blanket. At
13 no time did either officer ask if Harris was ok as he seemed to be under emotional duress. During
14 this time plaintiff repeatedly asked to speak to a supervisor especially as Reed told Harris it was the
15 law that while in a general public area Harris needed to have contacted a property rep and gotten
16 "authorization" to use the unposted outlet. As a former law enforcement officer and former federal
17 investigator Harris knew this was an unconstitutional seizure and told Reed he knew this was an
18 unlawful arrest. Reed relayed this information to his supervisor,  Sgt. Tom Clark who refused to
19 respond but stated Harris could speak to him once he was booked into jail. By his training, experience
20 and responsibility Clark had a duty to know that ordinary citizens do not need extra authority to visit
21 public places and cannot be arrested for simple use of common public spaces. Reed, Nixon's and
22  Clark's incredible lack of knowledge of or disregard for civil rights and constitutional protections was
23 negligent and done while using threats and violence, under color of law.

24

25 Equal Protection Clause under the 14th amendment- Despite, as identified in the attached exhibits,
26 photographs of an electrical charging platform with cords running to vehicles not two blocks from
27. the City of Kent City Hall and the City of Kent Police Department defendants claim it was a crime for
28. plaintiff to do virtually the same thing. The equal  protection and civil rights laws clearly require the
4th AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS-8. 2:20cv1045tlf William L Harris.  Pro se

1 enforcement of laws without regard to anything other than merit. Public accommodations laws under
2 civil rights expressly ban discrimination in public settings. Plaintiff argues the defendants in this case
3 violated a whole host of federal statutes and constitutional protections. Plaintiff virtually guarantees
4 not one of the car owners pictured all around kent with electrical devices running to their vehicles has
5 been threatened, assaulted, injured, arrested, and incarcerated. Defendant JLL is positioning itself as
6 as an industry leader in the parking lot vehicle electrical industry in alliances with groups such as
7 Electrify America (EA). Once again the unlawful double standard is obvious.

8

9. Title II of the Civil Rights Act of 1964 (Public Accommodations)- The act explicitly states that
10 discrimination on the entire premises of any retail establishment is outlawed. There is absolutely no
11 question Harris was aboard a retail establishment, was discriminated against while lawfully using a
12 de facto public accommodation, and that the defendants are the responsible parties. This nonsense
13 was being explained to Clark the whole time and still he approved the unlawful arrest.
14. 28 U.S.C. 4101 Defamation- Despite Curt Thornburg knowing full well that the light bearing the
15. outlet had a cost-saving, dawn to dusk, kill switch, installed that only allowed current to be
16 generated overnight (it was between 1130am-12noon when plaintiff was arrested). As site manager
17. Curt Thornburg knew full well Jacob Reed was lying to him about having probable cause for a theft
18. and he was lying to Reed. Yet they both engaged in a conspiracy to claim plaintiff was a thief and had
19. been caught red handed stealing without direct "authority " from JLL. In that public shopping center
20. there are myriad electrical outlet facilities which are used by customers everyday. Defendant's
21 ludicrous, constitutional, carve-out, argument does not address how those customers, and everyone
22. else using an auto or device charge is not also being arrested. Plaintiff was defamed, booked, and
23. branded a thief by Reed, Nixon and Thornburg's actions which were ratified by Clark. Plaintiff never
24. dreamed he would have to defend and reaffirm his constitutional right to be free from unlawful
25. treatment and arrest by fellow officers. Thornburg not only lied during a police investigation in order
26. to cover his own backside but JLL then submitted a knowingly false claim to this court claiming
27. plaintiff was in the process of stealing electricity.

28

4th AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS-9.  2:20cv1045tlf  William L Harris. Pro se

1 Negligence- The City of Kent and Kent Police Department leadership have known for some time of a

2. rogue element within their midst. Despite a continuing series of very brutal attacks upon black men

3. by a subculture of violent extremist police officers the department admits it never statistically

4. tracked the problem while also knowing that scores of officers were ending up in federal court under

5. civil rights claims. According to media reports, when police leaders learned that certain Kent officers

6. were going online to espouse, violent, vitriolic, online postings, regarding certain segments of the

7. population they are sworn to serve the chief of police contacted police union leaders and asked if the

8. union leaders could have it's members tone it down so the comments would not be so visible within

9. the community. Plaintiff argues part of the reason the instances of beatings, shootings, and other

10 events of Kent police attacks on black men for "crimes" that are almost universally thrown out of

11 local court, litigated in federal court, and later settled is because the city has negligently chosen to

12 attempt to mollify those who are disgruntled over an ever changing city. City leaders had a duty of

13 care, they breached such duty, causing harm to plaintiff who now seeks damages due to that harm.

14 Due to their negligence scores of kent officers are regular occupants of the U.S. District Court docket.

15 Title 18 U.S.C. 241 -Conspiracy against rights- Reed and Thornburg conspired to accuse plaintiff of a

16 crime while both knowing full well that no such crime had ever been committed by plaintiff.

17 A. The events occurred at the Panther Lake Shopping Center in Kent, Washington

18

19 B. The events occurred at approximately 1135am, 15 December 2019

20

21 C. Reed, assisted by Nixon, used threats of violence, both used violent and physically painful tactical

22 hand control techniques where no crime had been committed. In violation of federal laws and

23. Constitutional protections, Reed, assisted by Nixon, demanded Harris provide authorization

24 documents showing he was at liberty to freely use an electrical outlet which had no restrictions in

25 the mall parking area. This unlawful seizure was approved by Reed and Nixon's supervisor and

26. conducted in coordination with the property manager who has provided information showing that

27. no crime was committed.

28                                    **V. INJURIES**

4th AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS-10. 2:20cv1045tlf   William L Harris. Pro se

1  Plaintiff has sustained both long term physical and emotional scarring from this event. Although the

2. physical pain was the most immediately painful the emotional and mental health effects have been

3. the most enduring.  Plaintiff was already attempting to deal with the pending loss of his brother when

4. accosted by Reed and Nixon. Despite their awareness that Harris seemed to be upset neither of them

5. inquired as to if plaintiff was ok, where there something they could do, maybe a grief counselor or

6  even the police chaplain. Even first responders and former first responders have moments where they

7 go through emotional trauma.  Plaintiff has no doubt if he had been other than a black male some

8 level of care and compassion would have been afforded. Within seconds of getting his car door open

9 defendants went "hands on " and Harris was unlawfully on his way to jail with Reed smiling and

10 waving to passersby. The smirks from Reed when Harris told Reed that he had also been an officer

11 and a soldier were very apparent.  Harris stopped complaining about the pain of the cuffs because he

12 could see Reed smile each time he mentioned how much pain he was experiencing.  Neither Reed

13 nor Nixon ever bothered to call for medical attention as Harris complained about pain and Reed

14 mentioned that plaintiff had experienced pain to jail staff at booking. Plaintiff experiences constant

15 nightmares from the arrest along with feelings of despair at being led naked to a waiting police car

16 as plaintiff has seen of black men down through history. Now on video somewhere plaintiff is forever

17 being unlawfully led half naked to a Kent police car. In the internet and cloud age these images are

18 forever. Plaintiff bruised,  swollen,  aching, fingers, and hands eventually subsided but not before

29. many sleepless nights. Plaintiff is now trying to mentally deal with the fact that defendants are

20 inferring he might not have the civil and constitutional rights as all other citizens. This stance is

21. morally repugnant but not a total surprise. Between them Reed, Nixon, Clark, or Thornburg could

22. have mitigated what happened but plaintiff was just another "undesirable ". The physical, mental,

23. emotional pain has been excruciating.

24

25.                                    **VI.  RELIEF**

26. Though he was committing no crime but merely exercised his civil and constitutional rights at a time

27  of tremendous grief plaintiff was threatened,  assaulted,  injured, arrested, and incarcerated. This

28. treatment was not based upon the rule of law  but instead some fly by the seat of your pants, made

4th AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS-11  2:20cv1045tlf. William L Harris   pro se

1 up legal theory from Jacob D. Reed who was attempting to rewrite federal, state, as well as local

2 city municipal ordinances from the front seat of his patrol car. Instead of enforcing the laws as

3. trained at the police academy and by his department Reed started making it up for arrests. Plaintiff

4 argues the sad part is that individuals who knew better, and could have put an end to the nonsense,

5 either fled the scene, unlawfully assisted, conspired with him, or ratified and approved the arrest. In

6 addition, a city and police department who knew they had a group of out of control officers who were

7 targeting certain groups did nothing- not even go start statistically tracking events. When the leaders

8 found out that certain of these officers were becoming more vocal about their feelings to hurt

9 the very same individuals they were sworn to protect and serve the leaders sought to have them keep

10 it quiet. Every day we see pictures in the media of law enforcement and community leaders, around

11 the country, making it loud and clear that abusive and unlawful police practices will not be tolerated

12 in their communities and those found to have engaged in such practices shall be prosecuted to the

13 fullest extent of the law. Is there any question of why this continues to happen in the great, diverse

14 City of Kent? Plaintiff has endured painful injury, public humiliation, continuing nightmares, anxiety,

15 and long-term emotional distress. Plaintiff seeks compensatory and general damages of

16 2, 725, 000.00 (two million seven hundred twenty five thousand dollars) and punitive damages of

17 3, 625, 000.00 (three million six hundred twenty five thousand dollars). This 4th and final proposed

18 Amended complaint recognizes the gravity of what plaintiff and similar individuals have had to and

19 continue to endure. At times it feels as though Kent is an incredibly diverse and welcoming city. At

20 other times, for some individuals, it also feels that we are trapped in a 1960's era, Jim Crow, time

21 warp. One must ask why black men are not encountering this type police violence in nearby cities?

22.                         **VII. CERTIFICATION AND CLOSING**

23. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge

24. information, and belief that this complaint: (1) is not being presented for an improper purpose,

25. such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is

26. supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing

27. existing law; (3) the factual contentions have evidentiary support after a reasonable opportunity

28 for further investigation or discovery; and (4) the complaint otherwise complies with the

4th AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS-12. 2:20cv1045tlf. William L Harris  Pro se

1  requirements of Rule 11.

2. I agree to provide the Clerk's Office with any changes to my address where case-related papers may

3. be served. I  understand that my failure to keep a current address on file with  the  Clerk's Office may

4. result in the dismissal of my case.

5

6.  Date of signing.

7.  Signature of Plaintiff.

8.  Printed Name of Plaintiff.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4th AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS-13.  2:20cv1045tlf. William L Harris. Pro se



Sonia Joseph wipes away a tear in 2017 prior to entering the inquest hearing at the Maleng Regional Justice Center in Kent into the shooting of her son Giovonn Joseph-McDade by a Kent Police officer. FILE PHOTO, Kent Reporter

# City of Kent settles Joseph–McDade civil rights lawsuit for $4.4 million

### Giovann Joseph-McDade fatally shot by police after short pursuit in 2017

By Steve Hunter
Wednesday, April 14, 2021 12:16pm I [NEWS]

ADVERTISEMENT

The city of Kent agreed to pay $4.4 million to the family of Giovonn Joseph–McDade, the 20–year–old man fatally shot by Kent Police in 2017 after a short pursuit.

*Exhibit A*

(1)

The parents of Joseph-McDade filed a civil rights lawsuit in May 2020 in U.S. District Court in Seattle against the Kent Police Department alleging officers wrongfully killed Joseph-McDade on June 24, 2017. The case was close to going to a jury trial.

"All loss of life is tragic regardless of the circumstances," said city communications manager Bailey Stober in a Wednesday, April 14 press release to announce the settlement. "Our thoughts and condolences remain with the Joseph-McDade family. This settlement is a step in the right direction to bring closure to the family, the officers involved and the city as a whole. This case has been ongoing for several years and it was in the best interest of all involved to resolve the matter."

## Thank you for reading our news coverage.
Please consider subscribing or donating. **LEARN MORE** »

Additionally, at the family's request, the city will design and install a bench in a city park to memorialize Joseph-McDade, Stober said.

"We maintain that the officers involved acted within Kent Police Department policies and Washington state law," Stober said. "Investigations have been conducted, including assembling a King County inquest jury, and concluded confirming our officers acted within department policies, state law and the scope of their authority.

"This is a case that we were fully prepared to litigate and defend but recognize in the best interest of the family, the officers involved and our community we need to resolve the matter and attempt to bring closure to those involved."

The lawsuit claimed that the officers "deprived Mr. Joseph-McDade of these particular rights by engaging in an unreasonable, dangerous and violent vehicle pursuit and performing a seizure of Mr. Joseph McDade in an unreasonable, dangerous, and violent manner, and by shooting Mr. Joseph-McDade without legal cause or justification.

"Defendants Davis and Rausch took actions that no reasonable police officer would undertake, in violation of clearly established law, with willfulness and reckless indifference to the rights of others," according to the suit. "Defendants are liable pursuant to law for depriving Giovonn Joseph-McDade of his life, liberty, and property, and for punitive damages, compensatory damages and reasonable attorneys' fees and costs."

In a recap of the shooting, the lawsuit states that Officer Rausch saw Joseph-McDade's 1994 Honda Accord parked near the gas pumps at a Arco ampm parking lot at 10402 SE 256th St. For the next several minutes, Rausch sat in his patrol car and watched Joseph-McDade and passengers inside the Accord. Rausch later reported that he found it suspicious that, while he was watching them, the driver and passengers seemed nervous and one of them "had a scared look on his face."

Rausch stopped Joseph-McDade for driving with an expired registration—a nonmoving traffic violation, according to the suit. Joseph-McDade initially got out of the car to speak with Officer Rausch and was ordered to get back inside his car. Joseph-McDade complied, and got back into his car. Joseph-McDade began to drive away, and officers engaged in a police chase.

Speeds reached nearly 60 mph in a 35 mph zone along 104th Avenue Southeast, according to police reports.

Officer Davis joined the chase, only knowing the car had an expired registration. Within 1 minute and 22 seconds of first interacting with Joseph-McDade, Rausch attempted to ram his police vehicle into Joseph-McDade's car, according to the suit. During the next minute, Rausch rammed his police vehicle into Joseph-McDade's car two more times.

At a period of 2 minutes, 18 seconds, seconds after initiating contact with him, the officers boxed in Joseph-McDade's vehicle in a residential cul-de-sac at 99th Avenue South and South 244th Street near Canterbury Park.

To share your opinion for publication, submit a letter through our website https://www.kentreporter.com/submit-letter/. Include your name, address and daytime phone number. (We'll only publish your name and hometown.) Please keep letters to 300 words or less.



Giovann Joseph-McDade

## Recommended for You





TODAY

SNAP

PRINT SCHEDULE



Critics of the Kent Police Department are circulating an anonymous letter and body cam videos showing recent arrests.

CREDIT: (SCREENSHOT FROM KENT PD VIDEO)

### Kent police promises new policies and data in wake of anonymous campaign

FEB 16, 2021 at 8:40 AM

BY

 **Amy Radil**

 5 MINS

  

An anonymous letter and videos demanding changes in policing have roiled the city of Kent in recent weeks. Police Chief Rafael Padilla has appeared before the City Council to offer explanations and apologies. He said the department is moving quickly to unveil new policies and training.

Last month Kent officials received an open letter from a group calling itself "No Secret Police." The letter criticized the Kent Police Department's lack of policies and training for de-escalation. It also criticized the department's more frequent use of force in arrests of Black and Indigenous people. And

*Exhibit B*



TODAY

SNAP

PRINT SCHEDULE

woman. The man is seen facedown on the ground as the police sit on his shoulder to handcuff him. He says, "I'm not resisting, I can't even breathe right now." The video ends with the man being handcuffed and put in a police car. Officers take a photo of a bloodstain where the man's face was against the pavement.

The second video shows the arrest of a teenage girl last July. An officer finds her sitting on a curb in the middle of the night and thinks she might be someone else, a warrant suspect. She wears a face mask; the officers involved do not. She's handcuffed, and then officers tie her legs because she's kicking the door of the police car. She screams, "You guys do not have the right to detain me – for what?"

Officers told the people in both videos they were being arrested for "obstruction," but the charges were later dropped, raising questions about how and why Kent police made those arrests.

Kendrick Glover heads a nonprofit in Kent focused on mentoring youth.

"All I can say about both of these videos — it's just disrespectful," he said.

Glover said what's most distressing is that the girl in the second video tells officers she's homeless and has been in a fight. Yet when they release her minutes later, they don't try to connect her with any services.

"Which goes to show that KPD are not in tune with the resources which are right in their backyard," he said. "We try to reach out to [police] and say 'Hey, if you ever run across a young person that needs any type of support day or night here's a resource for you.'"



TODAY

 SNAP

PRINT SCHEDULE

departments have revised their training on that after the death of George Floyd at the hands of Minneapolis police, and Chief Padilla later apologized to the council for that statement.

"When I stated that if you can talk, you can breathe, I was absolutely 100% incorrect," he said the following week. Padilla said the department's current training states that being able to talk does not guarantee someone is getting enough oxygen.

The anonymous letter cited public disclosure requests that suggest that in 2019 Kent police used force nearly twice as often when arresting Black and Indigenous people compared to other groups (10% compared to 5.8%). It said the department fails to track statistics that could shed light on that disparity. Chief Padilla told the City Council they are planning to collect new data to examine whether racial bias is a factor.

"We have to get more information to be able to make that determination. So it's, I think, a clear case for why we need better systems, and we're working on that."

The letter also said that the Kent Police Department lacks long-awaited policies requiring de-escalation training for officers (as required by Initiative 940 which Washington State voters approved in 2018), and requiring them to intervene when they see potential police misconduct. Padilla told the Council those policies will be implemented in the coming days.

Kent City Councilmember Marli Larimer said she was distressed by another claim in the letter: that Padilla coordinated with the police union to get officers to delete offensive social media posts, including one that stated "The next time you hear someone say defund the police, punch them in the f---- mouth and see if they call 911."

"We tell officers to see something, say something," Larimer said. "But yet when it comes in the realm of a social media post that is promoting something unsavory, we basically tell them just to hide it."

Padilla responded that he takes department culture seriously, but none of the postings met the threshold for an investigation.

"What I did do is I picked up the phone, talked to the union president, said we've received this information, we're looking into it, I don't know that it crosses the line in terms of policy violation, but I think this would be a good time or opportunity to contact the membership and remind them of our policies and the potential outcomes," he said.







TODAY

*SNAP*

PRINT SCHEDULE

the Kent Police Department. However, courts have historically ruled that public employees, when not at work, are protected by their constitutional right to free speech, even if we don't agree with it. The Kent Police Department has made great strides in implementing new policies, in addition to the strong policies we already had in place, to ensure every resident is treated equitably and with the respect and dignity they deserve. These policies will be strongly enforced and regulate on the job conduct," the statement said.

The new scrutiny of the police department comes as the city of Kent faces a federal civil rights lawsuit over the death of 20-year-old Giovann Joseph-McDade, who was shot in his vehicle by Kent police in 2017. His mother Sonia Joseph said the lawsuit will examine whether the officer who shot her son was in harm's way as he has claimed.

"We, as community, want to hold officers accountable and that's the bottom line," Joseph said.

Earlier this month a federal judge in Seattle determined that the lawsuit can proceed to trial. Craig Sims is the family's attorney. He said the judge's recent decision is significant "because it removed the qualified immunity shield that often serves as protection for officers and does not allow families to seek accountability." Sims said Kent's policies and trainings will be discussed in upcoming trial, but he said the lawsuit is limited to examining actions of two officers involved and has "never been about being anti-police."

So far, only the Kent City Council has weighed in about the anonymous letter and body cam videos.

But some residents in Kent say they're anxious for more public dialogue about policing. Charmaine Boston is retired and has lived in Kent for 11 years. She says she participated in the city's Black Lives Matter march last June.

"As a police department and as citizens of this community we have to have the conversation," she said. "And we can't be scared of the conversation. And we have to *act* on that," she said.

Boston said she's tired of worrying about the safety of her 19-year-old grandson and his friends. She said she loves her city, and she'd like see her police department well-trained to serve one of the most ethnically diverse cities in the nation.



(5)



Police Chief Rafael Padilla. COURTESY PHOTO, Kent Police

# Kent City Council grills police chief about controversial arrest

Rafael Padilla put on hot seat about tactics, language used after members see video

By Steve Hunter
Wednesday, February 10, 2021 3:02pm | NEWS

A controversial video about how a Kent police officer took a Black man into custody caused the Kent City Council to put Police Chief Rafael Padilla on the hot seat for more than two hours during a recent Committee of the Whole virtual meeting.

The body-worn camera of the officer shows him swearing at the man, taking him to the ground and putting his knee on the man's shoulder for failing to obey his command to stop walking

ADVERTISEMENT

Exhibit C

(1)

away as he investigated a potential domestic violence incident. Lying face down on the ground, the man told the officer he had trouble breathing and that his shoulder hurt. Padilla said the officer had his knee on the man's shoulder for a little more than two minutes.

Council members asked Padilla to address the video at the Jan. 26 Committee of the Whole meeting after most of them recently received the video in an email. The incident is from April 10, 2020. Padilla agreed to answer any questions from the council.

**Thank you for reading our news coverage.**
**Please consider subscribing or donating. LEARN MORE »**

"It didn't violate policy or law, but some things we did not do well," Padilla told the council before walking them through the video that included taped comments from the chief. "It is very disturbing."

The chief said policy updates were done after command staff reviewed the video.

**The incident**

The incident began with a report by a witness of a possible domestic violence issue between a man and a woman shoving each other at the Safeway parking lot in the 200 block of Washington Avenue South.

An officer in the former Kmart parking lot saw a vehicle come into the lot with its headlights off and park. A man walked out of the vehicle and the officer said he matched the suspect's description of the fight across the street.

"Hello, Kent Police," the officer said as he walked up to the man.

"I don't trust you," the man responded.

"Stop right there, stop right there!" the officer said.

"I don't trust you," the man said again.

"I don't give a (expletive)," the officer said. "I'm telling you to stop."

The officer told the man he saw him drive over to the lot with the headlights off.

When the man refused to stop walking away, but ended up backed up to a fence, the officer told the man he was going to be put in handcuffs. He took the man to the ground from behind and put his knee on the man's shoulder.

Padilla explained to the council why the officer took action.

"The male had driven the car around to the backside of Kmart with the headlights off, so the officer thinks he's trying to hide the car," Padilla said."Using foul language, that's completely unacceptable, it doesn't de-escalate things at all and he has been spoken to about that."

Padilla said the male suspect was upset he was being asked to stop, but said that the law required him to stop.

"If an officer is investigating a crime and the male is involved in the crime, he must obey lawful orders," Padilla said. "When he doen't stop, he's technically violating law."

Padilla said the officer also might have been in danger because he didn't know if the man was looking to run or fight.

With the man on the ground, the officer told him to quick resisting.



(3)

"I can't even breathe right now," the man said. "I'm not resisting, you put my arm behind my back."

The man continued to talk.

"You didn't say please," the man said. "You don't look at me like a human being like you are. ...can you get off my shoulder. I can't breathe."

There are sounds on the video of the man struggling to breathe.

Padilla said the two officers on the scene decided to hold their position until backup arrived. The second officer was at the man's side to help hold him down.

"He says he's choking, and his breathing is impacted to a degree, but he's clearly still breathing because he's able to talk," Padilla said.

That comment led Councilmember Marli Larimer to question Padilla later in the meeting because she said she has read that just because someone is able to talk doesn't mean they aren't having trouble breathing.

**Chief apologizes about statement**

Padilla appeared at the Feb. 2 virtual council meeting to apologize to Larimer and the council for what he said and what he emphasized several times at the Jan. 26 discussion.

"I need to come to you tonight and apologize," Padilla said. "I provided some misinformation last week during my presentation and our in-depth discussion on the use-of-force incident that we watched on the video. When I stated that if you are able to talk, then you can breathe, I was absolutely 100% incorrect. That's outdated information and a misnomer and I am wrong and I apologize for that.

"I also want to thank Councilmember Larimer for pointing that out and holding me accountable for that so I could come back and get it correct," Padilla said.

Padilla said the training message sent out to officers is correct — that simply because you can talk does not mean you can get enough oxygen to sustain life.

reality, and that finally, a council member pointed that out to Chief Padilla during the council meeting. Now I'm left wondering, how can I trust that the Kent Police Department is taking our humanity seriously?"

Gonzalez asked the mayor and council to make sure Padilla implements new training policies.

"The Kent PD claims to serve with compassion, professionalism, respect, and integrity," Gonzalez said. "But the body-cam footage dated 4/9/2020 of the Black male who couldn't breathe ... does not show evidence of compassion, professionalism, respect, or integrity. ... I ask you today, with a heavy heart, to please hold the Kent Police Department accountable to their mission, values and principles. Our humanity depends on it."

---

**Talk to us**

Please share your story tips by emailing editor@kentreporter.com.

To share your opinion for publication, submit a letter through our website https://www.kentreporter.com/submit-letter/. Include your name, address and daytime phone number. (We'll only publish your name and hometown.) Please keep letters to 300 words or less.

**Recommended for You**

**Metformin Manufacturers Don't Want This Secret Out!**
Sponsored | Trending News...

**The 2021 Mazda Lineup Is Turning Heads. And Finally O...**
Sponsored | Mazda On Yahoo
Learn More

**Applying for Medical...**
Sponsored | Yahoo! Search ...
Apply Now





# Man files federal lawsuit against Kent Police for alleged brutality, excessive force

Four officers, K-9 unit took man into custody

By Steve Hunter
Wednesday, February 20, 2019 3:42pm | NEWS

A 56-year-old African-American man filed a civil rights lawsuit against the Kent Police Department for alleged brutality and excessive force that caused him to suffer severe and permanent injuries after officers stopped him for a reported misdemeanor warrant investigation.

David E. Lewis, of Seattle, filed the suit Feb. 15 in U.S. District Court in Seattle, according to a news release from the Seattle-based law firm of Shishido Taren. The suit is against the city of Kent, Officers Eli Morris, Eric Tung and Eliot Hale and former Officer Richie Plunkett. Lewis is seeking compensatory and punitive damages from the city of Kent and the individual officers, to the fullest extent available under the law.

Kent Police Chief Rafael Padilla said in a Wednesday email that the city hadn't received a copy of the complaint.

**Thank you for reading our news coverage.**
Please consider subscribing or donating. LEARN MORE »

Cl

4th Amended Complaint Violation of Civil Rights-9

(1) William Harris

2:20 CV 1045 TLF

"I'm aware, however, that a K-9 was used to help apprehend Mr. Lewis during an incident three years ago and that Mr. Lewis sustained several lacerations to his leg," Padilla said. "The use of force was reviewed by the chain of command and found to be within policy. Mr. Lewis was charged with resisting arrest and assault on a police dog, and I understand he's still awaiting trial on those charges."

Attorney Jordan A. Taren, who along with Robin Shishido and Eric Harrison represent Lewis, said in an email that the lawsuit wasn't filed until last week because criminal charges filed by city prosecutors against Lewis in Kent Municipal Court are still pending. Police arrested him that night for investigation of resisting arrest and crimes against a K-9 officer. A trial in November 2016 resulted in a hung jury, Taren said.

Since that time, the prosecution has requested multiple continuances, Taren said. Trial was set for the beginning of December 2018, but was continued three separate times, and is set for the beginning of March.

"As we moved closer to the statute of limitations on his civil rights claims, we decided to file now," Taren said.

U.S. District Court Judge Robert Lasnik will preside over the case. The city should receive a copy of the complaint this week, Taren said. Lewis has requested a jury trial.

Lewis was walking at about 1:47 a.m. on Feb. 18, 2016, in the 25800 block of Pacific Highway South on Kent's West Hill, when a police vehicle cut him off, according to the complaint. Lewis stopped walking after Officer Morris pulled his vehicle in front of him. Morris yelled at Lewis that he had a warrant, but didn't reveal what it was for after Lewis asked him. The attorneys for Lewis claim it was an alleged misdemeanor warrant.

Morris reportedly exited his vehicle with his Taser drawn and pointed it at Lewis. K-9 Officer Tung and his dog Kato arrived on the scene as Morris exited his vehicle. A third police vehicle pulled in behind Lewis, who carried a cellphone in one hand and an empty plastic detergent laundry jug in the other.

*4th Amended Complaint Violation of Civil Rights - 10*
*2:20 cv 1045 TLF*

*(2) William Harris Pro Se Clo*

Tung thereafter released Kato and directed the dog to attack Lewis, who reportedly didn't exhibit any signs or aggression or resistance and his hands were visible at all times.

Lewis backed up as the dog attacked and held the jug to try to protect his legs from being bit. When Lewis stepped back, Officers Morris, Tung and Plunkett also charged him. Morris shot Lewis in the leg with his Taser, according to the court papers. Tung used his flashlight and hit Lewis at least three times in the back and head, including while Lewis was on the ground covered by two officers with Kato biting and ripping his leg.

Plunkett and Morris allegedly had tackled Lewis to take him to the ground, causing his head to hit the pavement which led to injuries to his face and teeth. Plunkett repeatedly kneed Lewis in the ribs. Tung continued to direct the police dog to attack and the dog tore into the leg of Lewis, biting him at least four times, which caused cuts and puncture wounds. Hale allegedly helped hold Lewis down and with unreasonable force reportedly drove his head into the ground.

"Defendants, without provocation or cause, unreasonably used severe, dangerous and potentially deadly force, including releasing the K-9 unit, to attack plaintiff within moments of their arrival," the suit claims.

Paramedics transported Lewis to Valley Medical Center in Renton with injuries to his legs and face.

The suit claims the officers violated the Fourth Amendment rights of Lewis to not be subjected to unreasonable seizure with their use of excessive force and deploying a dangerous K-9 unit.

Lewis is the son of David Lewis, a well-known rock 'n' roll artist in the Pacific Northwest in the 1950s and '60s labeled the "Father of Northwest Rock," according to historylink.org. Lewis died of cancer in 1998.

Talk to us

Please share your story tips by emailing editor@kentreporter.com.

*4th Amended Complaint Violation of Civil Rights -11 (3) W. Chase Harris Pro/Se*

*2:20 CV 1045 TLF*

Cl

48°    57°    50°

LIVE EVENT: Biden & Harris speak on the economy

ADVERTISEMENT

# Kent agrees to pay $250K to settle excessive-force lawsuit

by Associated Press
Saturday, July 20th 2019

A



Search Site
Gavel

SEATTLE (AP) — The city of Kent has agreed to pay $250,000 to settle an excessive-force lawsuit
filed by a man who was shot with a Taser, beaten and bitten by a police dog during a 2016

*3rd Amended Complaint Violation of Carl Rights.12 2:20 CV 1045 TLF*     *(1)*    *William Harris*

48°        57°        50°

The Seattle Times reports David Lewis Jr. did not have a weapon when he suffered serious bite injuries to his leg, was hit with a metal flashlight and had his face ground into the pavement.

A civil rights lawsuit filed earlier this year in U.S. District Court says the incident happened after officers stopped him to serve a misdemeanor warrant at about 2 a.m. Feb. 18, 2016.

Geoff Grindeland, an attorney representing the officers and the city of Kent, said Friday that, although they believe the use of force was reasonable under the circumstances, it was more economical to settle the claim than to litigate it.

**MORE TO EXPLORE**

**Inslee announces restrictions on social gatherings, bars, restaurants**

**'This is very disturbing:' What is being done to protect Gov. Inslee from threats?**

**COVID-19: Inslee announces changes to state's plan to restart economic activities**

*E - 2*

*Amended Complaint Violation of Civil Rights -13*

William Harris
Pro Se

*2:20 CV 1045 TLF*



Kent Police Chief Rafael Padilla invites the crowd to take a knee with him on the lawn of the Maleng Regional Justice Center on June 11 prior to a protest march along downtown streets after the death of George Floyd, who was killed by a Minneapolis police officer. STEVE HUNTER, Kent Reporter

# Kent Police plan equity and social justice reform

Chief Padilla meeting with City Council, mayor, community to come up with resolution

ADVERTISEMENT

By Steve Hunter
Wednesday, August 12, 2020 1:07pm I  NEWS

The Kent Police Department is working with the Kent City Council, mayor and the community to implement equity and social justice reform.

"I get there's a lot of fear and anxiety surrounding policing in our country and people want change," Kent Police Chief Rafael Padilla said to the council during its Aug. 4 meeting. "I get that and we are making it happen."

F ₍₁₎

*Amended Complaint Violation of Civil Rights -14*

William Harris
2:20 CV 1045 TLF







